UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IN RE: EXPRESS SCRIPTS, INC.,   )
SECURITIES LITIGATION,      )
CLASS ACTION           )    Case No: 4:04CV1009 HEA
                           )
                           )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Consolidated Securities Complaint, [Doc. No. 44]. Plaintiffs oppose the Motion and the parties have filed extensive memoranda on the Motion. The Court has heard oral arguments as well. For the reasons set forth below, the Motion is granted.

In this consolidated securities case, Plaintiffs seek to bring a class action on behalf of all persons who purchased Express Scripts, Inc. common stock between October 29, 2003 and August 3, 2004, inclusive (the "Class Period") under the provisions of §§ 10(b) and 20(a) of the Securities Act of 1934. Plaintiffs claim that the action arises out of a fraudulent scheme by defendants to publicly issue false and misleading statements to the investment community about the success of Express Scripts' new business model, compliance with the applicable healthcare and related laws and its earnings and prospects for future growth. Plaintiffs claim

that the information provided by defendants, Express Scripts, Inc. and certain officers and directors, was knowingly false and misleading when issued and had the purpose of artificially inflating the market price of Express Scripts common stock during the class period.

Defendants move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act. Defendants argue that the Amended Consolidated Complaint fails to demonstrate a causal link between the loss for which Plaintiffs seek compensation and any alleged misstatement or omission; none of the statements set out in the Complaint constitute a material misrepresentation or omission; Plaintiffs fail to make particularized allegations giving rise to a strong inference that any defendant acted with a wrongful state of mind. Defendants also assert that Plaintiffs' "controlling person" claims are deficient as a matter of law.

## Factual Allegations[1]

Express Scripts provides integrated pharmacy benefit management (PBM) services, including network pharmacy claims processing, mail pharmacy services,

---

[1] The factual allegations are taken from the Amended Consolidated Securities Complaint, which includes certain SEC filings, press releases and transcripts of conference calls. Furthermore, the Complaint sets out facts of the filing of a lawsuit by the former Attorney General of the State of New York. The Court may take judicial notice of SEC filings and public records in considering the motion to dismiss.

benefit design consultation, drug utilization review, formulary management, disease management, medical and drug data analysis services, and medical information management services. It also provides distribution services for specialty pharmaceuticals through its Specialty Distribution subsidiary. Express Scripts' operations are highly regulated by federal and state healthcare laws, rules and regulations.

Plaintiffs claim that by 2003, Express Scripts' business had begun to slow down and its stock price declined as it struggled to overcome increased competition in the PBM industry. To overcome this situation and continue Express Scripts' growth, in late 2003 defendants embarked upon a public relations campaign designed to artificially inflate Express Scripts' common stock price. Plaintiffs further allege that Defendants also caused the Company to engage in a myriad of unlawful business practices, stating that these unlawful practices included, among other things, fraudulently inducing customers to enter into contracts with Express Scripts by misrepresenting the discount amounts they would receive for retail drug purchases, diverting to itself millions of dollars in drug manufacturer rebates that belonged to its customers, inflating the costs of generic drugs at the expense of its customers, selling client prescription data to drug manufacturers, data collection services and other third parties without the

permission of its customers and/or the patients, and fraudulently inducing physicians to switch patients from one prescription drug to another for which the Company received money from the drug's manufacturer.

The Complaint further alleges that as result of, and reflecting the positive image created by defendants of Express Scripts' business and prospects, securities analysts repeatedly issued "Strong Buy," "Outperform" and "Overweight" recommendations emphasizing Express Scripts' successful new business model, expanding PBM and specialty distribution businesses, and strong earnings and growth prospects.

Plaintiffs allege further that the false image of Express Scripts created by defendants' statements to investors and securities analysts drove Express Scripts' stock price to a Class Period high of $81.20, while Express Scripts insiders sold 176,274 shares of Express Scripts stock, realizing more than $12,986,277 in "unlawful" proceeds for themselves. Defendant Bascomb, Express Scripts' Director and Executive Vice President, sold 29.6% of the Express Scripts stock that he actually owned, for proceeds of more than $1,296,400; Defendant Ignaczak, Express Scripts' Senior Vice President-Sales and Account Management, sold 68.2% of the Express Scripts stock that he actually owned, realizing $1,444,144 in "unlawful" insider trading proceeds; Defendant Logsdon, Express Scripts'

Executive Vice President, sold 41.5% of the Express Scripts' shares that she actually owned, for proceeds of more than $2,256,714; Defendant Porter, Express Scripts' Senior Vice President-Client Services, sold 35.2% of the Express Scripts shares that he actually owned, for proceeds of more than $428,466; Defendant Zachary, Express Scripts' Director, sold 66.6% of the shares that he actually owned, for proceeds of more than $2,264,080; Defendant Tenholder, Express Scripts' Senior Vice President and Chief Administrative Officer, sold 61.5% of the Express Scripts shares that he actually owned, for proceeds of more than $3,511,199; Defendant Waltman, Express Scripts' Director, sold 92.5% of the Express Scripts shares that he actually owned, for proceeds of more than $1,785,275.

Plaintiffs contend Defendants' positive statements, creating the impression that Express Scripts was successfully pursuing its business and faithfully serving its clients which would lead to solid and dependable revenue and earning growth, were false and misleading when made, because defendants failed to disclose the material adverse facts. In particular, Plaintiffs allege that Express Scripts was, during the Class Period, cheating its customers and engaging in numerous other unlawful business practices which made it very probable that the Company would not continue to achieve strong financial results.

The Complaint alleges that suddenly, on August 4, 2004, the Attorney General of New York filed a lawsuit against Express Scripts, seeking more than $100 million in damages, and alleging that Express Scripts fraudulently induced New York to enter into a contract by misrepresenting the discount amount it would receive for retail drug purchases, improperly changing patient medication, and improperly selling client prescription data to unauthorized third parties. These revelations stood in sharp contrast to defendants' Class Period representations that Express Scripts' interests were clearly aligned with those of its customers and members, and that Defendants were running Express Scripts' business within the strictures of the applicable health care related laws, rules and regulations. Plaintiffs further allege that as a result of this revelation, Express Scripts' stock collapsed, falling from $71.85 per share to $62.48 per share on extraordinary heavy volume.

**Statements allegedly false and misleading**

Plaintiffs set out the following statements which they contend are false and misleading:

> On October 29, 2003, Express Scripts announced its 3rd Q FY03 results, ended September 30, 2003, reporting a 21% increase in net income to a "record" $64.5 million, or $.81 per share, on revenue of $3.2 billion. In the Company's earnings release, defendant Toan, with the approval of the remaining defendants, attributed the Company's "record" results to the success of Express Scripts' new business

- 6 -

model and aggressive use of generic and low-cost brand-name drugs:

"While the PBM competitive landscape continues to evolve, the one thing that has remained constant is our focus on making prescription drugs safer and more affordable. . . . We have revitalized our business model in 2003 to ensure that our clients "understand that our interests are unequivocally aligned with theirs. This revitalization resulted in Express Scripts no longer accepting pharmaceutical manufacturer funding for programs promoting the use of specific drugs. This revitalization differentiates our business model in the marketplace, and positions Express Scripts as a leader with the most value to offer to plan sponsors and their members."

"The Express Scripts business model has resulted in reduced gross profit and selling, general and administrative expenses this year attributable to the elimination of this pharmaceutical manufacturer funding. However, we believe our business strategy will yield long-term benefits, clearly differentiating Express Scripts from the competition, which has already allowed us to gain market share. Express Scripts' Client Pledge, issued earlier this year, underlines our commitment to aggressively promote the use of generic drugs, support the use of clinically appropriate lower-cost brand-name drugs, and never recommend switching a member to a higher cost drug."

"In addition to our business model, our industry-leading generic utilization rate, superior formulary management of low-cost brand drugs, and highly-efficient, cost-effective mail pharmacy services are also strong competitive differentiators, and reflect the alignment of our interests with our plan sponsors and their members."

\*      \*      \*

"We have taken our business model to the specialty drug space to help our clients manage the costs and benefits associated with high-cost biotech and injectable drugs, with growing results . . . . Our goal is to provide the same type of value in specialty pharmacy that we provide in the PBM arena". . . .

Commenting on Express Scripts' FY03 and FY04 earnings outlook,

defendants stated:

Express Scripts is enjoying a strong selling season for 2004. In addition, 10 of Express Scripts' top 50 clients were up for renewal effective January 2004, and the Company was successful in renewing 100 percent of this business. Based on net new business wins to date, and the underlying fundamentals of the business, the Company expects revenue growth next year to exceed $1.3 billion, excluding approximately $0.8 billion of retail drug costs for the DoD TRICARE Retail Pharmacy program discussed below. New business wins have come from all segments including state governments, self-funded employer groups, Blue Cross Blue Shield plans, large health maintenance organizations, health insurers, third party administrators, and union-sponsored benefit plans.

*     *     *

In addition to this growth in membership, the Company's financial performance will continue to benefit from increased mail and generic utilization, improved formulary compliance with low-cost brands, increased productivity, growth in specialty distribution and capital structure improvements. Based on these strong fundamentals, the Company believes its 2003 diluted earnings per share, including the $0.04 per share charge incurred in the second quarter resulting from the early retirement of debt, will be between $3.14 and $3.16. While Express Scripts has not completed its selling season for 2004, the Company believes its 2004 diluted earnings per share will increase 20 percent to 25 percent over 2003, excluding any charges associated with the early retirement of debt. . . .

With respect to Express Scripts' stock repurchase program, defendants further stated that "[d]uring the third quarter, the Company repurchased 530,000 shares of common stock for $33.8 million and repaid $25.0 million of debt."

Following the release of the Company's 3rd Q FY03 earnings press release, securities analysts issued reports on Express Scripts which were based on and repeated the false information provided by Express Scripts' senior management to them. For example, on October 30, 2003, Southwest Securities, Inc., issued a report in which

it recommended the purchase of Express Scripts stock following a conference call with management. In its report, Southwest Securities, Inc., rated Express Scripts stock a "Strong Buy" based largely upon defendants' representations about the
Company's strong FY04 earnings growth rate of 20% to 25%:
ESRX reported 3Q03 numbers in line with our projections and the consensus estimate; $0.81 versus $0.67. The company reiterated its prior FY03 and FY04 guidance during the call. We continue to rate the shares a Strong Buy and view the pull back in share price today as a buying opportunity. ESRX has produced consistent 20%-25% earnings growth over an extended period of time, has had a good selling season for FY04, is still working on signing additional FY04 accounts, and has significantly reduced SG&A expenses for the quarter. Our $79 price target is based on 20x our FY04 EPS estimate of $3.89. In addition, ESRX has approximately $14.72 a share in book value and $3.65 a share in cash. We believe these metrics continue to make it an attractive value at these levels.

On October 30, 2003, Express Scripts filed its 3rd Q FY03 Report on Form 10-Q with the SEC, containing the information released to the market in the October 29, 2003 press release. The Form 10-Q report signed by defendants Toan and Paz was also certified by defendants Toan and Paz under §§302 and 906 of the Sarbanes-Oxley Act of 2002. With respect to Express Scripts' 3rd Q FY03 financial statements, defendants represented:

We believe the accompanying unaudited consolidated financial statements reflect all adjustments (consisting of only normal recurring adjustments) necessary to present fairly the Unaudited Consolidated Balance Sheet at September 30, 2003, the Unaudited Consolidated Statements of Operations for the three months and nine months ended September 30, 2003 and 2002, the Unaudited Consolidated Statement of Changes in Stockholders' Equity for the nine months ended September 30, 2003, and the UnauditedConsolidated Statements of Cash Flows for the nine months ended
September 30, 2003 and 2002.

On November 12, 2003, defendants attended the CIBC World Markets Fourteenth Annual Healthcare Conference. During the conference held at the Plaza Hotel in New York, defendants gave a very strong and upbeat presentation on Express Scripts' business and projected FY04 earnings of $3.14-$3.16. Defendant Toan added: "We are well positioned for sustainable growth in the future." Following the conference, and based on conversations with defendants, securities analysts and members of the financial press wrote positive reports on Express Scripts. For example, on November 13, 2004, *DowJones Newswire* reported:

Pharmacy-benefits manager Express Scripts Inc. (ESRX) is poised for sustainable growth, Chairman and Chief Executive Barrett Toan said Wednesday.

Another Express Script official, joining Toan at the CIBC World Markets Healthcare Conference, voiced confidence in the company's 20% to 25% earnings-growth estimate for 2004.

*     *     *

Express Scripts' offering is differentiated and the company has made acquisitions that have added to earnings and fostered growth, he said. Membership has grown year over year, and the company has landed and continues to pursue large accounts, Toan said.

"We are well positioned for sustainable growth in the future," the CEO said.

*     *     *

"We make money when our client saves money," he said, noting that Express Scripts makes more on generics than on branded drugs. "Our interests are perfectly aligned with our clients and their members."

*    *    *    *    *    *    *    *    *    *    *

On this news, Express Scripts common stock increased from $59.00 per share to over $65.00 per share, providing the means for Express Scripts to make acquisitions. For instance, on December 22, 2003, Express Scripts announced a deal to acquire CuraScript, one of the nation's largest specialty pharmacy services companies for $335

million.  Commenting on the acquisition, defendants stated:
CuraScript will enhance Express Scripts' ability to provide
comprehensive clinical services in many disease states and improve
the quality and affordability of specialty drug therapy for clients and
patients.  The specialty pharmaceutical market is expected to grow 20
to 30 percent or more annually over the next 3 to 5 years as
there are over 350 products targeting more than 200 diseases in the
biotech pipeline today.

*     *     *

When viewed together, Express Scripts' Specialty Pharmacy Benefit
Services ("SPBM"), Specialty Distribution Services ("SDS") and
CuraScript will clearly position Express Scripts among the leading
companies in the specialty pharmacy services market.  This will
complement Express Scripts other PBM value-added services
including the Company's industry-leading generic utilization rate and
standing as the nation's second largest mail services pharmacy.
Based on the most recent month's results, CuraScript's current
annual run rate of revenue and operating income was approximately
$425 million and $21 million, respectively. Revenue and operating
income have historically grown more than 30 percent per year, and
are expected to grow in excess of 35 percent in 2004 due to new
clients under contract, which will be implemented in 2004.  After
deducting merger-related costs, debt service charges, depreciation
and amortization expenses and taxes, the acquisition is expected to be
slightly accretive to earnings in 2004. . . .

Following the CuraScript announcement, and based on conversations
with defendants, securities analysts issued positive reports on
Express Scripts. For example, on December 22, 2003, First Analysis
Securities Corp. issued a report written by Grant Jackson, based
on his discussions with defendants, stating:

Express Scripts, Inc. ($63.95) today announced the acquisition of
Curascript, a FL based specialty drug distributor focusing primarily
on oncology (generally through a wholesale model), rheumatoid
arthritis, multiple sclerosis and Hepatitis C, which also has a small
PBM. We view the acquisition positively as it provides ESRX with a
much needed boost to its specialty program, through added

- 11 -

distribution infrastructure, and operating and clinical experience. . . .

Similarly, on December 22, 2003, Anne Barlow of Southwest Securities, Inc. wrote:

ESRX ACQUIRES CURASCRIPT; REITERATING STRONG BUY RATING

\* \* \*

Acquisition Accretive to Earnings: ESRX management expects the acquisition to be accretive to earnings beginning in FY04. ESRX expects the acquisition to add $0.02-$0.03 in FY04 and as much as $0.10-$0.15 in FY05. . . .

\* \* \*

To account for the acquisition, we are increasing our FY04 estimate for ESRX from $3.89 to $3.91. We are reiterating our STRONG BUY rating and $79 price target, which is 20x our new FY04 estimate of $3.91.

On January 12, 2004, defendants attended the JP Morgan 22nd Annual Healthcare Conference. During the conference held at the Westin St. Francis Hotel in San Francisco, California, defendants gave a very strong and upbeat presentation on Express Scripts' business and projected FY04 earnings of $3.14-$3.16 per share. Commenting on Express Scripts' business model, which purportedly aligned Express Scripts' interests with those of its clients and members, defendant Paz stated:

This all comes back to a client pledge. When there was a lot of headlines in the Wall Street Journal and other places a year or so back that talked about the interest of PBMs and the way were doing things, we have actually had these business principles and policies that we've been talking about since we went public, and even before then. But we never really had it in a client pledge, so we were the first PBM to just – basically, we did not change our contract and we did not change the way we do business; what we did instead was to elaborate or put into writing our pledge to our clients, and sent it to every one of our clients. . . .

But I think there are three basic principles here. One is formularies. We never ever moved someone from a higher priced – from a lower priced drug top [sic] higher priced drug. If there is a lower priced drug that is not very efficacious but the doctor prescribes it, we will inform the doctor that that is a very low prescribed drug. But we tell them – but we don't switch it. It stays with that drug and that's the drug that is dispensed. We'll also on a quarterly basis notify the client of all of those decisions, but we never ever call – make an outbound call and switch that product. Likewise, if a higher priced drug is switched and it is not on formulary, it is third tier, that's where we switch. So we have switched from higher priced pure AWP priced products to the lower-priced. So, again, we look at economics but never sacrifice the safety of our patients – never.

Secondarily, the basic principle here is one of knowing who your boss is. We believe we have aligned our interests with that of the plan sponsors. . . . We believe by aligning with our plan sponsors because its cuts into our economics, no question about that. But it allows us to draw large levels of client participation and trust. And we believe that that's the recipe for success, is that when we go to a manufacturer to negotiate a discount, we're doing it on behalf of all of our plan sponsors and we're getting a percentage of the discount that the client has negotiated – that we have negotiated on their behalf. . . .

The third piece really is transparency. There's been a lot of noise about the black box of PBMs. And I'm sure sitting on the outside looking in, it appears as a black box, but we have always provided for client audits. Clients can come in and audit our numbers any time that they want. We have – on average have over 200 audits going on at any given time, usually to no avail. Things get adjudicated properly, they get (indiscernible) the scripts the way they're supposed to. And so basically, we have a very transparent business model. And we welcome our clients to come in and take a look.

On the same date, however, two unions representing management and university workers accused Express Scripts of keeping the savings from drug manufacturers, instead of passing them to clients

in a lawsuit filed in New York. In response to the lawsuit, Express Scripts issued a public statement denying the unions' charges. To allay investors' concerns over Express Scripts' alleged receipt of kickbacks from drug makers, defendants also stated that the Company "complied with . . . our contract with New York State" and that Express Scripts "never recommends switching a member to a higher cost drug." Instead, "[w]e align our interests to those of our clients and our members," defendants' spokesman Steve Littlejohn explained. "That's how we do business."

      *       *       *       *       *       *       *       *       *       *

On January 30, 2004, Express Scripts announced the completion of the CuraScript acquisition. Commenting on the acquisition, defendants stated:

"We are very pleased to welcome CuraScript into Express Scripts," said Barrett Toan, chairman and chief executive officer. "This acquisition will deliver a number of strategic benefits to both companies and will enhance Express Scripts' ability to provide comprehensive clinical services in many disease states and improve the quality of care. CuraScript shares our client-centric focus for managing specialty drugs, and together we will be able to make the use of high-cost specialty drugs safer and more affordable for clients and patients."

After deducting merger-related costs, debt service charges, depreciation and amortization expenses and taxes, the acquisition is expected to add $0.02 to $0.03 to 2004 diluted earnings per share, and $0.10 to $0.15 to 2005 diluted earnings per share. . . .

On February 24, 2004, Express Scripts announced its 4th Q FY03 and year-end FY03 results, ended December 31, 2003, reporting a 15% in net income to $67.4 million, or $.86 per share, on a 4% increase in revenues to $3.5 billion. Express Scripts' cash flow from operations also increased 21.2% to a "record" $176.5 million in the 4th Q FY03.  For FY03, Express Scripts reported a 18% increase in

net income to $249.6 million, or $3.16 per share, on a 8% increase in revenues to $13.3 billion. In the Company's earnings release, defendant Toan, with the approval of the remaining defendants, attributed the Company's strong results to the success of its business model and the CuraScript acquisition:

As we close the books on 2003, we believe we are well-positioned for 2004 and beyond," stated Barrett Toan, chairman and chief executive officer. "Our business model, which aligns our interests with those of our clients and members in making prescription drugs more affordable, differentiates us in the marketplace and contributed to strong new sales. . . .

The recent addition of CuraScript to the Express Scripts' family enhances our competitive positioning by increasing our ability to provide comprehensive clinical services for many diseases and improving the quality and affordability of specialty drug therapy for clients and patients, allowing us to offer our clients a cost-effective, single-source solution for drugs.

Commenting on Express Scripts' FY04 earnings outlook, defendants stated:

Express Scripts expects that its 2004 diluted earnings per share will increase 20 percent to 25 percent over 2003, excluding charges we expect to incur in 2004 that are associated with the early retirement of debt. The Company's financial performance will benefit from increased mail and generic utilization, improved formulary compliance with preferred, lower-cost brands, increased productivity, growth in its specialty PBM offering, capital structure improvements and higher membership.

Express Scripts experienced strong sales for 2004 business, and the net new business will begin during the second quarter with the addition of some large accounts including the TRICARE Retail Pharmacy program discussed below. Due to the fact that implementation dates for much of this new business will occur after the first quarter of 2004, but some of the corresponding

- 15 -

implementation costs will be incurred in the first quarter, the Company expects that first quarter 2004 diluted earnings per share will be in the $0.87 to $0.89 range. Earnings per diluted share growth for the remaining quarters of 2004 is expected to accelerate to achieve the 20 percent to 25 percent growth for the year as discussed above.

With respect to Express Scripts' stock repurchase program, defendants further stated that "[d]uring the fourth quarter, the Company repurchased 1.1 million shares of common stock for $64.0 million, and to date, Express Scripts has repurchased 8.1 million shares under its 10 million share repurchase program."

Following the release of the Company's 4th Q FY03 and year-end FY03 earnings press release, securities analysts issued reports on Express Scripts which were based on and repeated the false information provided by Express Scripts' senior management to them. For example, on February 25, 2004, Wachovia Securities issued a report written by Eric Veiel in which it recommended the purchase of Express Scripts stock following a conference call with management. In its report, Wachovia assigned Express Scripts its highest investment rating of "Outperfom" based largely upon defendants' representations that the Company was profitably executing its business model:

ESRX: Upgrading To Outperform, Raising Estimates

\*      \*      \*

Key Points
* 4Q03 RESULTS IMPROVED OVER 3Q AND 2Q. The company posted 4Q03 EPS of $0.86, one cent above our estimate and consensus. Higher gross profit was offset by higher than expected SG&A.
* STRONG MAIL VOLUMES. Mail-order claims were 8.6 million, 5% better than expected and 21% growth over 4Q02. Adjusted claims volume was 5% higher than in 4Q02.
* PERFORMANCE TO IMPROVE IN 2004. We believe that the new TRICARE retail contract and the addition of BCBS of Louisiana

combined with the acquisition of CuraScript will drive improvements in 2004 performance, especially in the second
half of the year.

* WE HAVE UPGRADED SHARES OF ESRX TO OUTPERFORM. We base our upgrade on an improved outlook for mail order growth, lower volatility in quarterly EPS due to improved guidance, easier comps thanks to anniversary of manufacturer agreement reductions, and the addition of CuraScript.

* RAISED 2004 AND 2005 ESTIMATES. We raised our 2004 EPS estimate to $3.95 from $3.86 and raised our 2005 EPS estimate to $4.65 from $4.52.

Similarly, after discussions with defendants, Southwest Securities, Inc., on February 25, 2004, recommended the purchase of Express Scripts stock as a "Strong Buy," based largely upon the Company's representation that it business enjoyed strong demand and rapid growth.

The report written, by Anne Barlow, stated:

ESRX REPORTS 4Q03 RESULTS; REITERATING STRONG BUY RATING

\*       \*       \*

ESRX reported 4Q03 EPS of $0.86, beating the consensus estimate of $0.85 and our estimate of $0.84. During the quarter the company saw strong mail script growth and improved upon its industry-leading generic utilization rate (generic scripts currently represent 48% of the company's total script volume).  The company reiterated its December 2003 guidance of an EPS growth rate of 20%-25%. . . .

\*       \*       \*

We are reiterating our STRONG BUY rating and $79 price target, based on 20x our FY04 estimate of $3.91. Reasons to buy the shares include:

Attractive Relative Value: We believe ESRX stock continues to represent a relative value at its current level. Even after a strong performance today, the stock is trading at approximately 18x our FY04 estimate of $3.91, a significant 20% discount to its peers.

Revenue Visibility and Client Retention: For FY05, none of the company's top ten clients are up for contract renewal. Only eight of the next 25 largest clients, representing less than 3% of gross profit, are up for contract renewal in FY05, making FY05 revenues very visible at this time.

Likewise, on February 26, 2004, First Analysis Securities Corp. issued an report on Express Scripts in which it assigned Express Scripts common stock its highest investment rating of "Overweight":

We maintain our overweight rating on Express Scripts due to strong Q4 claims volume and gross profitability, coupled with excellent retention prospects for 2004 and 2005. In our view, there is upside to Express Scripts' 2004 earnings guidance and our estimates, based primarily on continued improvements in generic and mail conversion rates, the latter of which grew by 276 basis points year-over-year in Q4. . . . Accordingly, we continue to believe Express Scripts remains attractive at its current price, which is approximately 14.8x our 2005 ESP estimate of $4.81. . . .

On February 25, 2004, Express Scripts filed its 2003 Report on Form 10-K with the SEC, for the period ending December 31, 2003, containing the information released to the market in the February 24, 2004 press release. The Form 10-K signed by defendants Paz, Toan, Waltman, Weinrich and Zachary was also certified by defendants Toan and Paz under §§302 and 906 of the Sarbanes-Oxley Act of 2002. The auditors' report integrated into Express Scripts' Form 10-K also represented that the financial information contained in the report complied with GAAP, stating:

In our opinion, the consolidated financial statements listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of Express Scripts, Inc. and its subsidiaries at December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the

index appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

With respect to Express Scripts' business practices and compliance with the federal and state healthcare and related laws governing the Company's business, defendants stated:

Many aspects of our businesses are regulated by federal and state laws and regulations. Since sanctions may be imposed for violations of these laws, compliance is a significant operational requirement. We believe we are operating our business in substantial compliance with all existing legal requirements material to the operation of our businesses. . . .

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

On March 5, 2004, defendants attended the Lehman Brothers Seventh Annual Healthcare Conference. During the conference held at the Loews Hotel in Miami Beach, Florida, Express Scripts gave a very strong and upbeat presentation on the Company's business and projected FY04 earnings growth of 20% to 25%, or approximately $3.14-$3.16 per share. Following the conference, and based on conversations with defendants, securities analysts and members of the financial press wrote positive reports on Express Scripts. For example, on March 5, 2004, *DowJones Newswire* reported:

The engines that will drive Express Scripts, Inc.'s (ESRX) top and bottom lines this year include new clients and increased use of generic drugs, the company's vice president of investor relations said.

Speaking Friday at the Lehman Brothers Global Healthcare Conference in South Beach, Fla., which was Webcast, David Myers reiterated that the pharmacy benefits manager also expects the increased use of mail to fill prescription orders, increased productivity, capital structure improvements and other factors will also give a boost to revenue and earnings.

Those factors will help Express Scripts have earnings in 2004 that are 20% to 25% higher than last year, excluding charges from the early retirement of debt, Myers reiterated.

On April 28, 2004, Express Scripts announced its 1st Q FY04 results, ended March 31, 2004, reporting a 20% in net income to $70 million, or $.89 per share, on a 13% increase in revenues to $3.6 billion. Express Scripts' mail pharmacy prescriptions also increased 25% to a "record" 9.3 million during the 1st Q FY04. In the Company's earnings release, defendant Toan, with the approval of the remaining defendants, attributed the Company's strong results to the success of its business model and aggressive use of generic drugs and mail order prescriptions:

"We are pleased by our strong start in 2004, and our outlook for the future," stated Barrett Toan, chairman and chief executive officer. "The record level of mail and generic utilization this quarter demonstrates the increased demand for our PBM tools, which help clients reduce their drug trend. Members covered by step therapy programs have more than doubled from last year to over 10 million, and clients implementing these programs experience, on average, a two percent increase in generic utilization. Our business model aligns our interests with our clients and members, and we benefit when our members use more generics, choose preferred lower-cost brand drugs and take advantage of our cost-effective mail services."

Commenting on Express Scripts' FY04 earnings outlook, defendants stated:

The Company believes its financial performance will continue to benefit from increased membership, growth in mail and retail prescriptions beginning in the second quarter, further increases in generic utilization, improved formulary compliance with preferred, lower-cost brands, growth in its specialty PBM offering, increased productivity, and capital structure improvements. Based on these strong fundamentals, Express Scripts believes that its 2004 diluted earnings per share will increase 20 percent to 25 percent over 2003, excluding charges the Company incurred in the first quarter and anticipates incurring in the second quarter for the early retirement of

debt, and the termination payment discussed above.

Following the release of the Company's 1st Q FY04 earnings press release, securities analysts issued reports on Express Scripts which were based on and repeated the false information provided by Express Scripts' senior management to them. For example, on April 28, 2004, Wachovia Securities issued a report written by Eric Veiel in which it recommended the purchase of Express Scripts stock. In its report, Wachovia rated Express Scripts common stock "Outperform" based largely upon defendants' representations that the Company's earnings growth would accelerate during the second half of FY04:

* WE HAVE MAINTAINED 2004 AND 2005 EPS ESTIMATES. Express Scripts reiterated its 2004 EPS guidance for 20-25% growth over 2003.

Valuation Range: $79 to $88

We believe that Express Scripts shares could trade in the range of $79-88 over the next 6-12 months, based on a 17-19x multiple of our 2005 EPS estimate of $4.65. This compares to the company's three year average forward P/E multiple of 19.5x and the PBM industry average of 19.6x. The shares currently trade at a discount to both one year and three year averages. Primary risks to our valuation are continued government scrutiny and litigation, and the threat of increased competition in the PBM industry.

\* \* \*

We continue to believe that ESRX's 2004 EPS growth will accelerate in the second half of the year as the company realizes benefits from the TRICARE retail business, the BlueCross and Blue Shield of Louisiana contract, and from the CuraScript's acquisition. Additionally, we believe that ESRX could see some benefit in H2 2004 from the Medicare discount drug card although our expectations are relatively modest. Additionally, we believe that ESRX has good visibility on 2005 earnings because none of its top 25 accounts renews in 2004 or January 2005, and only 8 of its top 50 accounts renew between now and January 1, 2005.

We have raised our valuation range to a range of $79-88 from $74-84. . . .

Similarly, after discussions with defendants, Southwest Securities, Inc. recommended the purchase of Express Scripts stock with a "Strong Buy" rating, based largely upon defendants' representation that Express Scripts enjoyed strong revenue growth. The report, written by Anne Barlow, stated:

ESRX reported 1Q04 EPS of $0.89 (including a $0.04 gain in conjunction with an early termination fee and a $0.03 charge due to the refinancing of the company's credit facility). Excluding the gain and the charge, the results were in line with the consensus estimate and our estimate of $0.88. Revenues for 1Q04 were $3.6 billion. Mail prescriptions grew to 9.3 million, an impressive 25% increase over last year. Additionally, the generic utilization rate grew to 49%. We believe that the increase in branded mail volume put some pressure on the gross profit margin, however gross profit per script was still up at $1.82 versus last year's $1.75. The company produced cash flows from operations of $97.8 million. ESRX reiterated its guidance of EPS growth of 20%-25% over FY03. . . . We are reiterating our Strong Buy rating. . . .

Likewise, following Express Scripts' 1st Q FY04 earnings announcement, First Analysis Securities Corp. issued a report written by Grant Jackson and raised its price target for Express Scripts from $80.00 per share to $84.00 per share based on the Company's strong prospects for future earnings growth. In the report, First Analysis Securities Corp., after discussions with defendants, stated:

ESRX: In-line Q1 helped by strong mail growth; maintain overweight

*     *     *

* Raising price target to $84 from $80 based on strong earnings visibility into 2005 with no top-25 clients up for renewal. Valuation modest at less than 18x our 2005 EPS estimate, approximately in line with our five-year growth expectations.

*     *     *

We maintain our overweight rating on Express Scripts after the company reported an in-line first quarter with EPS (ex-charges) of $0.88. We believe the company has strong earnings visibility into 2004 and 2005, considering no top-25 clients are up for renewal for January 2005 and the company has always maintained strong cost discipline. . . .

*     *     *

* Management reported that the CuraScript (specialty) acquisition has gone faster and better than hoped, and instead of expecting upside in 2005, the company now believes upside in earnings from CuraScript is possible in 2004 due to significant interest from existing clients.

On April 28, 2004, Express Scripts filed its 1st Q FY04 Report on Form 10-Q with the SEC, containing the information released to the market in the April 28, 2004 press release. The Form 10-Q report signed by defendants Toan and Stiften was also certified by defendants Toan and Stiften under §§302 and 906 of the Sarbanes-Oxley Act of 2002. With respect to Express Scripts' 1st Q FY04 financial statements, defendants represented:

We believe the accompanying unaudited consolidated financial statements reflect all adjustments (consisting of only normal recurring adjustments) necessary to present fairly the Unaudited Consolidated Balance Sheet at March 31, 2004, the Unaudited Consolidated Statements of Operations for the three months ended March 31, 2004 and 2003, the Unaudited Consolidated Statement of Changes in Stockholders' Equity for the three months ended March 31, 2004, and the Unaudited Consolidated Statements of Cash Flows for the three months ended March 31, 2004 and 2003.

With respect to Express Scripts business practices and compliance with the federal and state healthcare laws governing the Company's business, as well as ongoing governmental investigations into the PBM industry, defendants continued to reassure investors that they were conducting Express Scripts' business in a lawful manner: "We

- 23 -

believe that our services and business practices are in compliance with all applicable laws, rules and regulations in all material respects, and we will cooperate fully with the government in these investigations."

*     *     *     *     *     *     *     *     *     *

On July 28, 2004, Express Scripts announced its 2nd Q FY04 results, ended June 30, 2004, reporting a 9% in net income to $65.4 million, or $0.83, on a 13% increase in revenues to $3.8 billion. Express Scripts' cash flow from operations also increased 52% to $55.5 million. In the Company's earnings release, defendant Toan, with the approval of the remaining defendants, attributed the Company's strong results to the success of its business model, the aggressive use of generic drugs and mail order prescriptions:

"Our results for the quarter reflect outstanding efforts throughout our organization," stated Barrett Toan, chairman and chief executive officer. "We implemented a significant amount of new business, including the TRICARE program, launched the Pharmacy Care Alliance ("PCA") Medicare discount card, and achieved record levels of mail and generic utilization. The increased utilization of generics and mail pharmacy services, including specialty injectables, reflects the trend for greater management of the pharmacy benefit, which will translate into lower costs for our clients and improved profitability for Express Scripts."

Commenting on Express Scripts' FY04 earnings, defendants stated:

The Company believes its financial performance will continue to benefit from increased membership, growth in mail and retail prescriptions, further increases in generic utilization, improved formulary compliance with preferred, lower-cost brands, growth in its specialty PBM offering, increased productivity, and capital structure improvements.

Based on current circumstances, Express Scripts believes that its 2004 diluted earnings per share will increase in the lower half of the

20 percent to 25 percent range over 2003, excluding non-recurring items. The non-recurring items on a diluted per share basis include $0.13 for charges the Company incurred in the first half of 2004 for the early retirement of debt, and $0.04 for the termination payment the Company received in the first quarter. In addition, the guidance excludes the effect of increasing legal reserves expected to occur in the third quarter.

With respect to Express Scripts' stock repurchase program, defendants further stated that during the quarter "the Company repurchased 554,000 shares of common stock for $42.3 million." Defendants further stated that "[o]n On July 27, 2004, the Company's Board of Directors increased the authorized share repurchase program to permit the Company to purchase up to an additional 5.2 million shares."

Plaintiffs further allege that Defendants, in discussing the 2nd Q FY04 results, also stated that the Company had received a Notice of Proposed Litigation from the Office of the Attorney General for the State of New York and a Civil Investigative Demand from the Attorney General of the State of Vermont. Defendants reiterated the belief that Express Scripts believed its services and business practices were in compliance with all applicable laws, rules and regulations. Defendants also announced it was evaluating the adequacy of legal reserves and expected to increase the reserves in the third quarter for the costs of defense. The 2nd Q FY04 Report on Form 10-Q was filed with the SEC contained this information.

Express Scripts stock fell from $71.85 per share on July 28, 2004 to $65.36

per share on July 29, 2004.

On August 4, 2004, the Attorney General for the State of New York filed a lawsuit against Express Scripts, alleging that the Company had improperly withheld rebates that should have been paid to the state of New York and manipulated its prescription pricing schemes to New York's detriment in breach of its duties. Plaintiffs allege Defendants caused Express Scripts to issue a statement denying the allegations in the lawsuit and its intention to vigorously defend the action. By the close of trading on August 4, 2004, Express Scripts stock had declined another 2%, falling from $63.85 per share on August 3, 2004, to $62.48 per share on August 4, 2004.

Plaintiffs further allege that during the Class Period, Defendants caused Express Scripts to violate GAAP and SEC rules by its failure to timely reserve for a known loss contingency and by its failure to provide full and adequate disclosures concerning the "improper practices designed to improperly inflate its revenues..."

The Complaint alleges the same allegations of a series of deceptive schemes designed to improperly inflate Express Scripts' revenues as the New York law suit: improperly increasing the cost of prescription drugs to certain health plans by offering pharmacies a higher-than-warranted price for drugs whose entire cost

could be passed onto a client in exchange for a lower-than-warranted price for drugs where Express Scripts had guaranteed a certain price with its client and could retain any savings if it purchased the drugs for less; misappropriating rebates paid by manufacturers that belonged to its clients by disguising them as special fees; inducing physicians to switch their patients' prescription to drugs whose manufacturers paid Express Scripts for the favor; selling and licensing data belonging to its clients without proper authorization to third parties. Plaintiffs claim Express Scripts did not establish legal reserves for the liabilities arising therefrom.

Plaintiffs also allege Express Scripts did not disclose the alleged improper practices during the Class Period in violation of GAAP, and did not fully disclose the serious nature of the threatened lawsuits and investigations due to the alleged improper practices in violation of GAAP. Further, Plaintiffs claim that Express Scripts presented its financial results and statements which violated GAAP.

Plaintiffs allege Defendants had access to, and used Express Scripts files and computer systems to monitor the allegedly improper practices and all the while making false positive statements about Express Scripts' new business model, aggressive use of generic and low-cost brand name drugs and mail order prescription services, which Defendants said increased profitability.

Plaintiffs allege that Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Express Scripts' stock price and operated as a fraud or deceit on Class Period purchasers by misrepresenting the Company's financial results, business success and future business prospects. According to the Complaint, Defendants achieved this by blatantly misrepresenting the Company's compliance with the applicable laws and falsifying the Company's financial statements. Plaintiffs claim that when the prior misrepresentations and fraudulent conduct were disclosed and became apparent, Express Scripts' stock fell precipitously as the prior artificial inflation came out of Express Scripts' stock price. Plaintiffs claim they were damaged as a result of these alleged misrepresentations and fraudulent conduct.

## <u>Discussion</u>

Section 10(b) and Rule 10b-5 prohibit fraudulent conduct in the sale and purchase of securities. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. *McAdams v. McCord* 584 F.3d 1111, 1113 (8th Cir. 2009). Claims require (1) a material misrepresentation or omission, (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 760 (8th Cir. 2009)

(citations omitted). "As a check against abusive litigation by private parties, Congress enacted the [PSLRA]. Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007) (internal citation omitted). The PSLRA heightens the Federal Rule of Civil Procedure 12(b)(6) standard in two important ways. First, the PSLRA provides that to survive a motion to dismiss, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). *In re Hutchinson Technology, Inc. Securities Litigation* 536 F.3d 952, 961 (8th Cir. 2008).

Under the PSLRA and Federal Rule 9(b), a complaint must state with particularity the circumstances of the alleged fraudulent statement. *In re K-tel Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002). The complaint must also "state 'with particularity' facts giving rise to a 'strong inference' that the defendant acted with

the scienter required for the cause of action." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir.2001), quoting 15 U.S.C. § 78u-4(b)(2). The PSLRA requires plaintiffs "to specify each misleading statement or omission and specify why the statement or omission was misleading." *Kushner v. Beverly Enters, Inc.*, 317 F.3d 820, 826 (8th Cir. 2003)(citing 15 U.S.C. § 78u-4(b)(1)). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78-4(b)(2); see also *Kushner*, 317 F.3d at 826 (citation omitted). In evaluating this information, the PSLRA requires the Court to consider plausible opposing inferences. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. at 310 (2007). Finally, the Court must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements." *Kushner*, 317 F.3d at 824 (quoting *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001)).

This complaint contains numerous allegedly fraudulent statements by the executives in press releases and Express Scripts' financial statements. Plaintiffs claim these statements were misleading because the "truth was revealed" when the Attorney General for the State of New York filed the lawsuit against Express Scripts *alleging* that Express Scripts had engaged in improper behavior.

A complaint must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. To adequately plead loss causation, the complaint must state facts showing a causal connection between Defendant's misstatements and Plaintiffs' losses. *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir.2008), citing *Dura*, 544 U.S. at 347. Loss causation in a securities fraud case is analogous to the common law's requirement of proximate causation. *Schaaf*, 517 F.3d at 550. Plaintiffs must show "that the loss was foreseeable and that the loss was caused by the *materialization of the concealed risk*." *Id*. (emphasis added)(citation omitted).

The Complaint alleges that during the Class Period, Defendants continuously asserted that the Company's new business model was successful and that the Company's interest were aligned with its clients. Plaintiffs' allege that these statements were misleading when made because Defendants were engaging in the improper practices alleged in the New York suit. The Complaint alleges that as a result of the improper practices that were "clarified" and details of which were first learned through the New York suit, Plaintiffs have been damaged. These conclusory statements do not sufficiently allege loss causation. Plaintiffs have completely failed to state any facts which establish that Defendants' statements were not truthful. Plaintiffs presume the truth of the allegations contained in the

New York suit, but fail to present any materialization of the fraudulent behavior upon which they rely.

Plaintiffs do not contend that Defendants concealed the facts of the investigation, (nor could they, in that it is clearly established that Defendants disclosed the investigations and the notice of proposed litigation), rather, Plaintiffs rely solely on the truth of the allegations in the New York suit to state their claim. The complaint states that the truth about Defendants' scheme was revealed on August 4, 2004, when the Attorney General filed suit, thereby establishing that Defendants' statements must have been false when made, however, Plaintiffs fail to plead any facts that those statements were not true. Defendants continued to deny any allegation of misconduct and Plaintiffs have not plead any facts which establish the truth of the allegations. In essence, Plaintiffs have put the proverbial cart before the horse.

The Complaint also alleges that Plaintiffs suffered damages because they purchased stock at "artificially inflated prices." This allegation is insufficient under *Dura*. Specifically, a stock's subsequent loss in value can reflect a variety of factors other than the earlier misstatement. *Dura*, 544 U.S. at 342-43 ("When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic

circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."); *Schaaf,* 517 F.3d at 550. Quite possibly, the fact of the investigation and the market's reaction to that information could have caused the drop in the value of the stock, but Plaintiffs do not contend that Defendants' statements were untrue because the investigations were occurring; they allege that the statements were misleading because of the "schemes to defraud" and that Defendants omitted to disclose their scheme. "In order to satisfy the Reform Act's falsity pleading standard, a complaint may not rest on mere allegations that fraud has occurred. *Chen v. Navarre Corp. ( In re Navarre Corp. Sec. Litig.*), 299 F.3d 735, 742 (8th Cir.2002). Instead, the complaint must indicate why the alleged misstatements 'would have been false or misleading at the several points in time in which it is alleged they were made.' *Id*. at 743. In other words, the complaint's facts must necessarily show that the defendants' statements were misleading. *Fields*, 390 F.3d at 549 (Wollman, J., concurring)." *In re Cerner Corp. Securities Litigation,* 425 F.3d 1079, 1083 (8th Cir. 2005). See *McAdams* 584 F.3d at 1113-1115.

Plaintiffs cannot pursue a Section 20(a) claim because a Section 20(a) claim is derivative of their claims under Section 10(b). Accordingly, the dismissal of

their 10(b) claims are fatal to their Section 20 claim. *In re Hutchinson Technology, Inc. Securities Litigation* 536 F.3d at 961.

## Conclusion

Plaintiffs have failed to satisfy the pleading requirements to state a claim under the PSLRA. Their claims are therefore dismissed. Because they fail to state a Section 10(b) claim, their Section 20(a) claims are likewise dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Consolidated Securities Complaint, [Doc. No. 44], is granted.

**IT IS FURTHER ORDERED** that this matter is dismissed.

Dated this 30th day of June, 2010.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE